IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SIGNANT HEALTH HOLDING CORP., SIGNANT HEALTH LLC, SIGNANT HEALTH GLOBAL LLC, and SIGNANT HEALTH GLOBAL SOLUTIONS LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> DEFINIUM THERAPEUTICS, INC. F/K/A MIND MEDICINE, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )  Civil Action No.: _____ <br><br> JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiffs Signant Health Holding Corp., Signant Health LLC, Signant Health Global LLC, and Signant Health Global Solutions Limited (collectively, "Signant" or "the Company"), by their undersigned counsel, bring this action for injunctive relief and money damages against Definium Therapeutics, Inc. f/k/a Mind Medicine, Inc. ("MindMed").

## INTRODUCTION

1.   MindMed—in its rush to initiate Phase 3 and gain approval for its highly-touted LSD treatment for psychiatric conditions—ran a flawed procurement process that included trade secret theft and self-dealing by a top executive.

2.   Clinical trials form an integral part of the discovery and development of new medications—the Food and Drug Administration ("FDA") requires them before a new treatment can be brought to market. Clinical trials ensure medications are safe and effective for patients. For

this reason, it is critically important clinical trials yield reliable results measured with the best technology, informed by experience and integrity.

3.    In its latest clinical trial(s), MindMed is giving lysergide D-tartrate ("LSD") to patients with diagnosed psychiatric disorders—delicate and important work that requires an experienced Electronic Clinical Outcome Assessment ("eCOA") program. Clinical outcome assessments are critical for determining treatment efficacy. Patients need to be interrogated carefully to flag potentially adverse clinical outcomes; a faulty process thus endangers patients. Similarly, if patient health is not rated carefully to identify clinical outcomes, a treatment's efficacy may be vastly overstated.

4.    MindMed—now called Definium Therapeutics, which according to its website is "guided by precision and scientific rigor"—knows this. Contrary to these fundamental guideposts, MindMed selected an inexperienced eCOA vendor for its Phase 3 trials, EMA Wellness ("EMA"), which had never run a central rating Phase 3 trial before.

5.    Upon information and belief, EMA has been working to "knock-off" Signant's platform, hiring former Signant employees for their confidential knowledge of Signant's technology and, through them, stealing Signant's confidential and trade secret protected information, which has been developed through leveraging over 25 years of experience in eClinical technology and services.

6.    Despite its unlawful efforts, as of the time of MindMed's RFP process, EMA's technology platform was still deficient—so MindMed itself took trade secrets and proprietary information that Signant gave MindMed under strict contractual confidentiality obligations, and fed those trade secrets to EMA in an effort to shore up EMA's nascent capabilities and mask

EMA's inability to perform. MindMed's Director of Global Clinical Development Todd Solomon led this scheme and now holds a financial stake in EMA.

7.     Indeed, Solomon engaged in private discussions with EMA personnel during the RFP process, sharing confidential information about Signant's pricing, methodologies, and MindMed's specific preferences and concerns. Solomon's disclosures enabled EMA to enhance, refine, and expand its own eCOA capabilities using Signant's proprietary work product, so that EMA could use it for MindMed's Phase 3 clinical trial. Solomon was the fox guarding the henhouse—and he gave EMA the keys. That course of conduct not only violated trade secret law— it broke MindMed's contractual commitments.

8.     Until MindMed and Solomon intervened, EMA lacked the technological prowess and mature industry know-how to perform this work. Their misconduct raises significant questions regarding the integrity and independence of EMA vis-à-vis MindMed, and provided Solomon with an incentive to take Signant's confidential and trade secret protected information and share it with EMA.

9.     In light of this conflict, MindMed's decision to use an inexperienced partner in its Phase 3 trials further raises troubling questions about whether the Phase 3 data will be accurate, unbiased, and trustworthy. It also casts doubt on whether MindMed really believed EMA was best positioned to accurately measure LSD's impact on psychiatric patients when it chose the vendor.

10.     MindMed knew Solomon had access to confidential and proprietary Signant information. Upon information and belief, MindMed knew or should have known about Solomon's relationship with EMA, including his financial interest in EMA and his personal stake in EMA. MindMed also knew or should have known Solomon was engaged in private communications with EMA personnel, including former Signant personnel, throughout the RFP process, with Signant's

proprietary information flowing both ways, enabling EMA to tailor its bid. Upon information and belief, even after being informed of Solomon's part in this scheme to misappropriate Signant's confidential and trade secret protected information, MindMed has continued to both employ Solomon and utilize EMA's services.

11.    MindMed's Phase 3 selection process, infected by Solomon's personal motivations, was not in the public interest. Today, MindMed is actively administering MM120—a pharmaceutically optimized form of LSD—to patients with diagnosed psychiatric disorders, including Generalized Anxiety Disorder ("GAD") and Major Depressive Disorder ("MDD"). In such studies, patients experience profound perceptual and cognitive effects that create unique challenges for data collection and blinding. Qualified, independent central raters and robust eCOA systems are not luxuries—they are essential safeguards that ensure trial results reflect actual drug efficacy rather than placebo effects, bias or other distortions. Without reliable evaluation, dangerous side effects may go undetected, exposing patients to treatments whose safety and efficacy have not been properly established.

12.    The integrity and accuracy of clinical outcome assessments in trials involving psychoactive compounds like LSD is paramount. Indeed, the FDA has granted MindMed Breakthrough Therapy Designation for MM120 in GAD, reflecting the significant unmet medical need but also the heightened scrutiny that novel psychedelic treatments receive. MindMed's Phase 3 trials are the first-ever Phase 3 studies of LSD for any psychiatric condition. The stakes are high.

13.    MindMed cannot escape liability for Solomon's misconduct. Solomon was not a rogue actor—he was the executive MindMed entrusted to oversee their Phase 3 trial, including management of the RFP process and vendor relationships.

14. MindMed either directed Solomon's conduct, knew and approved of it, knew and turned a blind eye, or was so reckless in its oversight that it amounts to the same thing. Either way, MindMed is responsible for harm it caused by working in coordination with EMA to obtain and share Signant's confidential information and trade secrets with a competitor.

15. Signant brings this action to hold MindMed accountable for its brazen misappropriation of Signant's trade secrets, to recover the substantial damages MindMed's misconduct has caused, and to prevent MindMed from continuing to benefit from stolen intellectual property.

## THE PARTIES

16. Plaintiff Signant Health Holding Corp. is a Delaware corporation with its headquarters and principal place of business in Pennsylvania at 1055 Westlakes Drive, Suite 170, Berwyn, PA 19312.

17. Plaintiff Signant Health LLC is an affiliate of Signant Health Holding Corp. with its headquarters in Berwyn, Pennsylvania.

18. Plaintiff Signant Health Global LLC is an affiliate of Signant Health Holding Corp. with its headquarters in Pennsylvania.

19. Plaintiff Signant Health Global Solutions Limited is an affiliate of Signant Health Holding Corp. with its headquarters in Ireland.

20. Defendant Definium Therapeutics, Inc., formerly known as MindMed, is headquartered at One World Trade Center, Suite 8500, New York, NY 10007 and is a Delaware corporation. MindMed is a clinical-stage biopharmaceutical company developing novel product candidates to treat brain health disorders. Its lead drug candidate, MM120, is a proprietary formulation of LSD that MindMed is developing for the treatment of GAD and MDD. MindMed trades on NASDAQ under the ticker symbol DFTX. At all relevant times, Todd Solomon served

as MindMed's Director of Global Clinical Development—the executive directly overseeing Signant's Phase 2 work and the individual MindMed entrusted to run the Phase 3 procurement process. On January 12, 2026, MindMed rebranded itself as Definium Therapeutics, Inc.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Signant's claims arise under federal law, including the Defend Trade Secrets Act (18 U.S.C. § 1836), and supplemental jurisdiction over Signant's state law claims pursuant to 28 U.S.C. § 1367(a) as all claims herein form part of the same case or controversy.

22.    This Court has personal jurisdiction over MindMed and venue is proper in this District pursuant to Section 5.05 of the Mutual Confidentiality and Non-Disclosure and Agreement, in which "the parties consent to exclusive jurisdiction and venue in the federal courts sitting in New Castle County, Delaware . . . ." This Court also has personal jurisdiction over MindMed and venue is proper in this District pursuant to Section 14.4 of the March 16, 2022 Master Services Agreement, where MindMed "submit[ted] to the exclusive jurisdiction of the courts located in Wilmington, Delaware."

## FACTUAL ALLEGATIONS

### A. Signant Is an Industry Leader in Clinical Outcome Assessments

23.    Signant is a globally recognized evidence generation company and an industry leader in clinical trial services. Signant's SmartSignals platform and Electronic Clinical Outcome Assessment ("eCOA") Services represent years of investment, innovation, and refinement. These are not generic, off-the-shelf capabilities but rather proprietary systems that give Signant a decisive competitive advantage.

24.     eCOA services are critical to modern clinical trials. Electronic Clinical Outcome Assessments capture patient-reported outcomes, clinician observations, and performance metrics through validated electronic interfaces. In trials involving CNS drugs—including psychedelics like LSD—eCOA systems and qualified central raters are essential to ensuring data integrity. Central raters provide independent, blinded assessments that reduce variability, eliminate the potential for functional unblinding, and ensure that trial results reflect actual drug efficacy rather than placebo effects or rater bias.

25.     Signant has invested enormous resources developing and protecting its trade secrets, including its market strategies, proprietary data architecture, clinical trial methodologies, pricing models, and data quality monitoring procedures. These trade secrets have significant independent economic value precisely because they are not publicly available.

**B. MindMed's High-Stakes LSD Clinical Trials**

26.     MindMed is a clinical-stage biopharmaceutical company developing MM120, a proprietary and pharmaceutically optimized form of LSD, for the treatment of GAD and MDD. LSD is a synthetic psychedelic that temporarily alters perception, cognition, and emotions. MindMed's Phase 3 trials are the first-ever Phase 3 studies of LSD for any psychiatric condition.

27.     The FDA has granted MindMed Breakthrough Therapy Designation for MM120 in GAD—a designation reserved for drugs that treat serious conditions and show substantial improvement over existing treatments. This designation reflects both the significant unmet medical need and the heightened regulatory scrutiny that accompanies novel psychedelic treatments.

28.     MindMed's Phase 2b study met its primary and key secondary endpoints, demonstrating rapid, clinically meaningful, and statistically significant improvements on the

Hamilton Anxiety Rating Scale (HAM-A) at Week 4 and Week 12, with a 65% clinical response rate and 48% clinical remission rate sustained to Week 12 in the MM120 100 µg cohort.

29.    MindMed's MM120 Phase 3 clinical development program includes the Voyage and Panorama studies in GAD and the Emerge study in MDD. The Voyage study, launched in late 2024, was the first-ever Phase 3 trial of LSD for any condition. Panorama, launched in early 2025, is being conducted at sites in the U.S. and Europe.

30.    Because LSD produces profound perceptual and cognitive effects, clinical trials involving MM120 present unique methodological challenges. Participants who receive the active drug may experience effects that make it difficult to maintain blinding—a phenomenon known as "functional unblinding." The integrity of eCOA data in MindMed's trials is not a technicality—it is fundamental to whether MindMed can demonstrate MM120 actually works.

### C. Signant Delivered Exceptional Phase 2 Work—and Trusted MindMed with Its Trade Secrets

31.    In the fall of 2021, Signant began providing eCOA and Advisory Services to MindMed during Phase 2 of MindMed's MM120 clinical trial. Signant performed this work capably and reliably, enabling MindMed's Phase 2 to proceed without significant issue.

32.    Indeed, MindMed publicly touted Signant's successful rescue of MindMed's Phase 2 study, crediting Signant with enabling the trial to proceed. Even after awarding the Phase 3 contract to EMA, MindMed's CEO publicly praised Signant's work on Phase 2. These statements are irreconcilable with any suggestion MindMed chose EMA on the merits—upon information and belief, it chose EMA knowing it had never worked on a Phase 3 central rating study and thus needed to use Signant's stolen trade secrets and confidential information to perform the work capably.

33.    In performing the Phase 2 work, Signant necessarily shared confidential and proprietary information with MindMed pursuant to a March 16, 2022 Master Services Agreement ("MSA") with confidentiality and nondisclosure obligation. Signant shared this information in confidence, trusting MindMed would honor its obligations and not misuse it.

34.    On or about July 21, 2020, Signant's predecessor-in-interest, Bracket Global LLC, and MindMed executed a Mutual Confidentiality and Non-Disclosure Agreement ("NDA"). The NDA was entered into "to assure the protection and preservation of the confidential and proprietary nature of information" disclosed between the parties in connection with their business relationship.

35.    Under Section 1.02(a) of the NDA, MindMed agreed to "maintain in trust and confidence, and shall not disclose to any third party except with [Signant's] express prior written consent, any and all Proprietary Information" of Signant. MindMed further agreed to "use any and all Proprietary Information of [Signant] only for purposes of the parties' discussions hereunder." The NDA expressly prohibited MindMed from using Signant's Proprietary Information "for competitive purposes or to obtain any commercial advantage with respect to" Signant.

36.    Under Section 1.02(b) of the NDA, MindMed agreed "to protect the Proprietary Information of [Signant] with at least the same degree of care used to protect its own proprietary information from unauthorized use or disclosure, but in no event with less than a reasonable degree of care."

37.    On or about March 16, 2022, Signant and MindMed also executed the MSA, where Signant provided services "in connection with clinical studies sponsored by" MindMed.

38.    Under Section 11.1 of the MSA, MindMed agreed to a confidentiality provision that defined confidential information as "any non-public, proprietary, confidential and/or trade secret information disclosed by a party or its Affiliates ('Disclosing Party') provided that such

information is: (a) related to a party's products, technology, specifications, manufacturing methods, know-how, pricing, business or marketing plans, business relationships and intellectual property (including copyrights, patents, trademarks and trade secret); or (b) clearly identified as 'Confidential' at the time of disclosure; or (c) identified as Confidential Information in writing within five (5) days of disclosure if disclosed orally; or (d) information that a reasonably prudent person would recognize as requiring confidential treatment when provided to the party or its Affiliates receiving the other party's Confidential Information." Under Section 11.3 of the MSA, MindMed agreed that it "shall not disclose Confidential Information" "[d]uring the Term of this Agreement and for seven (7) years after the expiry or termination of last SOW under this Agreement." Specifically, MindMed agreed to "not disclose" Signant's Confidential Information, to "not use Confidential Information except solely for the purposes contemplated by this Agreement," to "use at least the same degree of care to safeguard Confidential Information that it uses to protect its own confidential and proprietary information," and to "make copies of Confidential Information only as needed for such purposes, all of which shall include any existing markings indicating that they are Confidential Information of" Signant.

39.     MindMed agreed to these contractual terms. MindMed then violated them—flagrantly and repeatedly.

**D. MindMed Chose a Cheap, Controllable Vendor Over Quality and Integrity**

40.     In the fall of 2023, MindMed opened a Request for Proposal ("RFP") process for Phase 3 of its MM120 clinical trial. As the incumbent vendor—having just delivered successful Phase 2 work—Signant was the logical choice to continue the engagement. Signant had the experience, the expertise, the infrastructure, and proven track record.

41.    Before MindMed handed EMA the Phase 3 contract, EMA had never conducted a single Phase 3 central rating study. EMA lacked the mature industry know-how to perform Phase 3 eCOA work. EMA was, in short, not prepared.

42.    But, MindMed could shape EMA, which was already developing a cheaper, "knock-off" version of Signant's platform, into whatever it needed—provided EMA had all the blueprints. Those blueprints included remaining Signant trade secrets it did not yet possess. And MindMed set about stealing them for its own and EMA's benefit.

### E. Solomon Corrupted the Procurement Process

43.    Solomon ran MindMed's procurement process. As MindMed's Director of Global Clinical Development, Solomon was the individual primarily responsible for inviting vendors to bid and overseeing the evaluation. He was also secretly working to ensure EMA would win—regardless of merit.

44.    Throughout the RFP process, Solomon engaged in private discussions with at least one member of EMA's personnel, providing them with real-time information about the bidding process and Signant's competitive position. Solomon told EMA Signant was preparing a bid for Phase 3 and through Solomon and in coordination with EMA, MindMed facilitated the disclosure of Signant's sensitive proprietary information. These communications gave EMA an unfair advantage that no legitimate competitor could have obtained through proper means.

45.    Signant submitted its Phase 3 bid on January 8, 2024, unaware the fix was already in. On or about February 8, 2024, MindMed informed Signant it had lost. The contract went to EMA—a company that, before receiving Signant's stolen trade secrets, had no business competing for this work. The timing was telling: within minutes of MindMed informing Signant it lost the

bid, a member of EMA's personnel, who had been simultaneously negotiating to rejoin Signant as an employee, abruptly withdrew from those negotiations.

**F. Solomon's Misconduct Continued After the Contract Award**

46.     Solomon was not content with merely disclosing Signant's trade secrets and proprietary information to assist EMA in securing MindMed's Phase 3 clinical trial contract. His—and thus MindMed's—misconduct continued well beyond the award of that contract.

47.     After MindMed selected EMA for its Phase 3 work, Solomon conspired with EMA and, on information and belief, others at MindMed to make additional, targeted efforts to obtain and convey Signant's, and potentially others', confidential materials to EMA. Solomon continued his private communications with EMA personnel, providing ongoing assistance as EMA sought to operationalize the stolen trade secrets for MindMed's Phase 3 trials.

48.     On information and belief, Solomon, while he was working for MindMed, engaged in these acts because he was obtaining a financial interest in EMA, which ultimately provided him with a personal stake in EMA's growth and success.

**G. MindMed Is Liable for Solomon's Misconduct**

49.     MindMed cannot distance itself from Solomon's actions. Solomon was not acting as a private individual—he was acting as MindMed's Director of Global Clinical Development, the executive MindMed specifically designated to manage the Phase 3 procurement. Every action Solomon took was within the scope of his employment and in furtherance of MindMed's business.

50.     MindMed placed Solomon in a position of trust with direct access to Signant's confidential information. MindMed empowered Solomon to run the Phase 3 procurement. MindMed gave Solomon the authority and opportunity to steal Signant's trade secrets and proprietary information—and Solomon did exactly that.

51.    MindMed knew or should have known what Solomon was doing. MindMed knew or should have known that Solomon, its Director of Global Clinical Development and the executive directly overseeing Signant's work on the Phase 2 clinical trial, had access to confidential and proprietary Signant information and, in the normal course of his employment, disclosed Signant's proprietary information and trade secrets to EMA.

52.    At all relevant times, MindMed knew or should have known of Solomon's ongoing relationship with EMA, including his financial and consulting interests in EMA. MindMed also knew or should have known Solomon was abusing his position and access to Signant's confidential information to advance EMA's eCOA business and capabilities, directly undermining Signant and interfering with the integrity of MindMed's clinical trial contracting process.

53.    Indeed, MindMed cannot credibly claim ignorance of the scheme unfolding before it. MindMed knew Signant successfully performed the Phase 2 work. MindMed knew Solomon, its own Director of Global Clinical Development, had extensive access to Signant's confidential information through his oversight of the Phase 2 engagement. MindMed knew or should have known EMA—a company with no prior experience conducting Phase 3 central rating studies— could not have developed the capabilities reflected in its Phase 3 proposal without access to Signant's trade secrets. MindMed's willingness to accept EMA's bid despite these obvious red flags reflects either active participation in the scheme or reckless indifference to the misappropriation occurring under its watch. Either way, MindMed is liable for the resulting harm

54.    Under established principles of agency and respondeat superior, MindMed is liable for Solomon's misconduct. MindMed cannot reap the benefits of Solomon's position while disclaiming responsibility for his actions.

*I. MindMed's Recklessness Continues to Cause Harm*

55.    MindMed's misappropriation of Signant's trade secrets has caused significant and ongoing harm. Signant lost the Phase 3 contract—a substantial business opportunity. That loss was not the result of fair competition; it was the result of MindMed's theft and corruption.

56.    The harm extends beyond the lost contract. MindMed continues to retain and benefit from Signant's confidential information. Indeed, MindMed's conduct continues to harm Signant—as MM120 continues towards approval, grounded on EMA's continuing use of Signant's trade secrets for MindMed, EMA's reputation is bolstered in the marketplace. Thus, every day that passes, Signant's competitive position erodes further.

57.    MindMed's actions were willful, malicious, and calculated. This was not a good-faith business dispute but a deliberate scheme to steal Signant's intellectual property, avoid paying for quality services, and hand critical clinical trial work to a cheap, controllable vendor. Such conduct warrants not only compensatory damages but also exemplary damages to punish MindMed and deter similar misconduct in the future.

**COUNT I**
**Breach of Contract**
**(Non-Disclosure Agreement and Master Services Agreement)**

58.    Signant reincorporates and re-alleges the foregoing allegations as if fully set forth herein.

59.    On or about July 21, 2020, Signant's predecessor-in-interest, Bracket Global LLC, and MindMed entered into a valid and enforceable Mutual Confidentiality and Non-Disclosure Agreement (the "NDA"). Signant is the successor-in-interest to Bracket Global LLC and is entitled to enforce the NDA's terms.

60. The NDA constitutes a binding contract supported by valid consideration—namely, the mutual exchange of confidential information to facilitate a business relationship between the parties.

61. Signant performed its obligations under the NDA. Signant disclosed its Proprietary Information to MindMed in confidence, for the purpose of facilitating the parties' clinical trial work, and in reliance on MindMed's contractual commitments to protect that information.

62. MindMed materially breached the NDA in multiple respects:

a. Breach of Section 1.02(a) (Duty of Confidentiality): MindMed breached its obligation to "maintain in trust and confidence" Signant's Proprietary Information by disclosing that information to EMA—a third party and direct competitor of Signant—without Signant's "express prior written consent."

b. Breach of Section 1.02(a) (Permitted Use Limitation): MindMed breached its obligation to use Signant's Proprietary Information "only for purposes of the parties' discussions" by using that information to assist EMA in competing against Signant, and to deprive Signant of a business opportunity.

c. Breach of Section 1.02(a) (Prohibition on Competitive Use): MindMed breached the NDA's express prohibition against using Signant's Proprietary Information "for competitive purposes or to obtain any commercial advantage with respect to" Signant.

d. Breach of Section 1.02(b) (Duty of Care): MindMed breached its obligation to protect Signant's Proprietary Information "with at least the same degree of care used to protect its own proprietary information from unauthorized use or disclosure."

63. On or about March 16, 2022, Signant and MindMed executed a Master Services Agreement (the "MSA").

64.     The MSA constitutes a binding contract supported by valid consideration—namely, the mutual exchange of confidential information to facilitate a business relationship between the parties.

65.     Signant performed its obligations under the MSA. Signant disclosed its Confidential Information to MindMed in confidence, for the purpose of facilitating the parties' clinical trial work, and in reliance on MindMed's contractual commitments to protect that information.

66.     MindMed materially breached the MSA's confidentiality provision:

        a.      Breach of Section 11.3 (Confidentiality): MindMed breached its obligation to "not disclose" Signant's Confidential Information by disclosing that information to EMA, to "not use Confidential Information except solely for the purposes contemplated by this Agreement," to "use at least the same degree of care to safeguard Confidential Information that it uses to protect its own confidential and proprietary information," and to "make copies of Confidential Information only as needed for such purposes, all of which shall include any existing markings indicating that they are Confidential Information of" Signant.

67.     MindMed's breaches were willful, deliberate, and in bad faith. MindMed did not inadvertently disclose Signant's information—it systematically funneled that information to a cheaper competitor through a corrupt procurement process overseen by MindMed's own executive.

68.     As a direct and proximate result of MindMed's breaches, Signant has suffered substantial damages, including the loss of the Phase 3 contract, competitive harm, loss of the economic value of its trade secrets and proprietary information, and other consequential losses, in an amount to be determined at trial.

69.     Signant is further entitled to all remedies available under the MSA and the NDA, including the equitable remedies contemplated by Section 5.05 of the NDA, which provides that "money damages would not be a sufficient remedy for any breach of this Agreement" and that the non-breaching party "shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach."

**COUNT II**
**Violation of the Delaware Uniform Trade Secrets Act (DUTSA)**
**(6 Del. C. § 2001 et seq.)**

70.     Signant incorporates and re-alleges every allegation above as if fully set forth herein.

71.     Signant's confidential and proprietary information—including its pricing data, proprietary data structures, operating procedures, methodologies, training programs, and data quality monitoring procedures—constitutes trade secrets under the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001(4).

72.     This information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. Signant has taken reasonable efforts under the circumstances to maintain its secrecy.

73.     MindMed, through Solomon acting within the scope of his employment, misappropriated Signant's trade secrets within the meaning of 6 Del. C. § 2001(2). MindMed acquired Signant's trade secrets through improper means, and disclosed and used Signant's trade secrets without Signant's consent while knowing or having reason to know that its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, or who owed a duty to Signant to maintain its secrecy or limit its use.

74.     MindMed's misappropriation has caused and will continue to cause irreparable injury to Signant for which there is no adequate remedy at law, including but not limited to the loss of competitive advantage, the erosion of the value of Signant's trade secrets, and ongoing harm to Signant's business relationships.

75.     MindMed's misappropriation was willful and malicious, entitling Signant to exemplary damages up to two times the actual damages awarded under 6 Del. C. § 2003(b).

76.     Signant is entitled to injunctive relief under 6 Del. C. § 2002, compensatory damages under 6 Del. C. § 2003(a), exemplary damages under 6 Del. C. § 2003(b), and attorneys' fees under 6 Del. C. § 2004.

### COUNT III
### Violation of the Defend Trade Secrets Act (DTSA)
### (18 U.S.C. §§ 1836(b), 1839 et seq.)

77.     Signant incorporates and re-alleges every allegation above as if fully set forth herein.

78.     Signant's confidential and proprietary information constitutes trade secrets under the DTSA: it derives independent economic value from not being generally known, and Signant has taken reasonable measures to keep it secret.

79.     MindMed, through Solomon acting within the scope of his employment, misappropriated Signant's trade secrets by disclosing them to EMA without authorization and by improper means.

80.     MindMed knew or had reason to know that its knowledge of the trade secrets was derived from Solomon, who owed a duty to Signant to maintain the secrecy of that information and limit its use.

81.     MindMed's misappropriation has caused and will continue to cause irreparable injury to Signant for which there is no adequate remedy at law, including but not limited to the

loss of competitive advantage, the erosion of the value of Signant's trade secrets, and ongoing harm to Signant's business relationships.

82.    MindMed's misappropriation was willful and malicious, entitling Signant to enhanced damages up to two times the actual damages awarded, plus attorneys' fees, under 18 U.S.C. § 1836(b)(3).

83.    Signant is entitled to injunctive relief under 18 U.S.C. § 1836(b)(3)(A), compensatory damages under 18 U.S.C. § 1836(b)(3)(B), and any other relief the Court deems just and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Signant respectfully requests that the Court:

a.    Enter judgment against MindMed on each Count of this Complaint;

b.    Award Signant compensatory damages in an amount to be determined at trial, including lost profits, unjust enrichment, and a reasonable royalty;

c.    Award Signant enhanced damages up to two times the compensatory damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and 6 Del. C. § 2003(b);

d.    Award Signant its attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and 6 Del. C. § 2004;

e.    Enjoin MindMed from continuing to use, disclose, or benefit from Signant's trade secrets and proprietary information;

f.    Order MindMed to return all documents and materials containing Signant's trade secrets and proprietary information;

g.    Award Signant its costs of suit;

h.    Award Signant pre-judgment and post-judgment interest; and

i.      Grant such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Jared Newton*

Jared W. Newton (#7519)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
Telephone: (302) 302-4000
jarednewton@quinnemanuel.com

Patrick D. Curran, *pro hac vice pending*
Eric D. Wolkoff, *pro hac vice pending*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199-7626
Telephone: (617) 712-7100
patrickcurran@quinnemanuel.com
ericwolkoff@quinnemanuel.com

Nathan Hamstra, *pro hac vice pending*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
Telephone: (312) 705-7400
nathanhamstra@quinnemanuel.com

James N. Boudreau, *pro hac vice pending*
Joseph J. Mahady, *pro hac vice pending*
REED SMITH LLP
Three Logan Square Suite 3100
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 851-8100

Facsimile: (215) 851-1420
jmahady@reedsmith.com
jboudreau@reedsmith.com